# EXHIBIT C

# MIDWEST TRANSPORT, INC.

## ADOPTION AGREEMENT

FCE

BENEFITS

# ADOPTION AGREEMENT
# FOR
# THE HEALTH & WELFARE PLAN
# OF
# MIDWEST TRANSPORT, INC.

Effective as of April 1, 2005, MIDWEST TRANSPORT, INC., a Delaware corporation ("Employer") adopts this Adoption Agreement and the Health & Welfare Plan of MIDWEST TRANSPORT, INC., (collectively "Plan").

## RECITALS

The purposes of this Plan are to (1) assure compliance with existing law and (2) provide health and welfare benefits for certain eligible employees of Employer and their eligible dependents.

This Plan is intended to comply with the applicable requirements of the Internal Revenue Code of 1986, as amended ("Code"), the Employee Retirement Income Security Act of 1974, as amended ("ERISA") and, to the extent applicable, the Service Contract Act of 1965.

## 1. ADOPTION OF PLAN

A. By adopting the Plan, Employer agrees to be bound by the terms of this Adoption Agreement and Exhibits thereto, and the Plan and Exhibits thereto, in the form attached to and made a part of this Adoption Agreement. Employer acknowledges its obligation to make contributions of amounts required by this Adoption Agreement, the Plan and the related Trust Agreement ("Trust").

B. This Plan Number for reporting and disclosure purposes for this Plan will be: 506

## 2. EMPLOYER INFORMATION

A. Entity Type. The Employer is a corporation, incorporated under the laws of the State of Delaware.



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

B. Employer Tax Identification Number: 71-0930845

## 3. EMPLOYER CONTRIBUTIONS

Employer will contribute on behalf of each eligible Employee an amount determined by an Employer/Employee agreement, an Employer/Client agreement, an Employer/Contracting Agency agreement, or a DOL Wage Determination Schedule or similar arrangement.

Those eligible Employees and Dependents and the related contribution amounts will be based on each New Group Information Sheet attached to and made a part of this Plan as Exhibits A-1, A-2 and following for each separate group that participates in the Plan. The New Group Information Sheet will contain, among other items, the contract site location and the contribution obligation for that site, as modified from time to time under the Plan.

## 4. DEFINITIONS

All capitalized terms under this Adoption Agreement will have the meanings defined in the Plan or Trust Agreement unless modified in this Adoption Agreement, or the context of this Adoption Agreement indicates a different meaning.

## 5. ALTERATION OF ADOPTION AGREEMENT

No change or amendment to this Adoption Agreement will be effective unless both Employer and the Plan's Third Party Administrator have approved that change in writing.

## 6. MISCELLANEOUS

This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which together will constitute a single document. This Adoption Agreement and Exhibits thereto, and the Plan and Exhibits thereto, will each become effective on the execution of a counterpart of it by each party to this Agreement.



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

IN WITNESS OF THIS ADOPTION AGREEMENT, Employer verifies, acknowledges and approves the information provided herein to include the Adoption Agreement and Exhibits thereto, which consists of the Fee Schedule, and the Plan and Exhibits thereto, which consists of the New Group Information forms, PHI Certification and Schedule 'I' and the Business Associates Agreement, and the Plan Funding Policy, and has executed this Adoption Agreement this 1st day of March, 2005.

EMPLOYER/PLAN SPONSOR/PLAN ADMINISTRATOR

**MIDWEST TRANSPORT, INC.**

By: ______________________
Ken Hohlbaugh

Title: President

THIRD PARTY ADMINISTRATOR

**FCE BENEFIT ADMINISTRATORS, INC.**
A California Corporation

By: ______________________
Gary Beckman, President, CEO



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

EXHIBIT 'A'
TO
ADOPTION AGREEMENT

FEE SCHEDULE
FOR
THE HEALTH & WELFARE PLAN
OF
MIDWEST TRANSPORT, INC.

Health & Welfare Plan

The following fees are based on total contributions due to the Trust, in accordance with Article 2.1 of the Trust agreement, Section 1.2 of the Plan agreement and Articles II and V of the TPA agreement. Each table below schedules the fee charged to total contributions due from Employer to the Trust. The fee decreases in a stepwise fashion at each incremental increase in the Number of Employees. The first 99 employees are charged differently from the next 399 employees, and so on. For purposes of efficiency and convenience, a weighted average fee is calculated twice annually for each listed service.

A (1). Medical and Ancillary Claims Administration (only if applicable)

| | NUMBER OF EMPLOYEES | | | |
|---|---|---|---|---|
| | Up to 99 | 100-499 | 500-999 | 1000-2499 |
| Claim Fee PEPM | $17 | $16 | $15 | $14.50 |

Add $4.50 PEPM for Major Medical Plans
Should FCE re-price Network Claims, it shall be paid the budgeted expense.

Fee is collected for a minimum of seven months annually for each covered employee. Fee continues for 4 months after an employee's benefits under the plan terminate.

A (2). Ancillary-Only Claims Administration (only if applicable)

| | NUMBER OF EMPLOYEES | | | |
|---|---|---|---|---|
| | Up to 99 | 100-499 | 500-999 | 1000-2499 |
| First Benefit Fee PEPM | $6 | $5 | $4.50 | $4 |
| Each Added Benefit Fee PEPM | $3. | $2.50 | $2 | $1.50 |

B. Plan Management

| | NUMBER OF EMPLOYEES | | | |
|---|---|---|---|---|
| | Up to 99 | 100-499 | 500-999 | 1000-2499 |
| Plan Management Fee PEPM | $22 | $21 | $20 | $19.50 |



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

C. Eligibility Administration

| | NUMBER OF EMPLOYEES | | | |
|---|---|---|---|---|
| | Up to 99 | 100-499 | 500-999 | 1000-2499 |
| Eligibility Administration Fee PEPM | $17 | $16 | $15 | $14.50 |

D. Plan Representation Services

| | NUMBER OF EMPLOYEES | | | |
|---|---|---|---|---|
| | Up to 99 | 100-499 | 500-999 | 1000-2499 |
| Plan Representation Fee PEPM | $17 | $16 | $15 | $14.50 |

Fee is reduced by commissions directly received by Plan Representative from Insurer

E. Trustee Services

For services provided by the Trustee as set forth in Article V of the Trust Agreement.

| | NUMBER OF EMPLOYEES | | | |
|---|---|---|---|---|
| | Up to 99 | 100-499 | 500-999 | 1000-2499 |
| Trustee Fee PEPM | $7 | $6 | $5 | $4.50 |

<u>Dismissal Wage/Unemployment Benefit Plan</u> (only if applicable)

In the event your Plan includes the Dismissal Wage/Unemployment Benefit (DUB), the following fees and budgeted expenses are applicable:

A. Monthly Administration (only if stand-alone) ............ $4.50 PEPM*
For work done at FCE tracking contributions per employee per month, paying for death benefit, posting earnings, and preparation of annual accountings for employees.

B. Annual Budgeted Expense ............ $10.00 PEPY
For work done at FCE and by independent accountant/auditor performing annual audit and preparing and filing annual tax return for DUB trust. This is not a fee.

C. Trustee's Fee (only if stand-alone) ............ $2.00 PEPM*
For work done by Trustee making deposits, distributions, reconciling account, and managing funds.

D. Distribution Processing Fee ............ $50.00 per employee
For work done at FCE obtaining verification of termination of employer, preparation of benefit election materials for employee, processing termination, distribution of benefit, preparation and filing of all required tax documents including W-2s, 941s and 940s.

*Asterisked fees are not charged if DUB is included in FCE administered health care plan.

Disclosure

FCE Benefit Administrators, Inc., and/or Steve Porter and Gary Beckman may receive commissions and/or administrative fees from insurance companies and benefit providers for services provided by FCE to this Plan. A portion of these commissions and administrative fees may be paid to the Plan Representative. Whether any commissions and/or fees are received, as well as the actual amount received, if any, varies from time to time and in accordance with benefit design changes. Additional information is available upon request.

Plan/Trust/TPA Agreement Termination

Special services will be required upon the termination of a Plan. These include preparation of final form 5500 and all other necessary tax reporting documents. Independent accounting/auditing fees will be charged at cost. Claims administration fees will be charged at the same rates set forth in this Exhibit for four months after extended benefit period terminates, for claims administration services during that time. Trustees' fee will be charged at $2.50 per participant per month for four months after extended benefit period terminates. In the event any then existing asset is distributed to the participants in cash, a dispensing fee of $15.00 per participant will be charged for a single fringe rate and $25.00 per participant will be charged for multiple fringe rates. Services shall be provided by the parties named in this agreement from year to year at the rates set forth herein unless modified by the parties in writing at least 60 days prior to the anniversary date of effective coverage under this Plan and Trust.



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

# THE HEALTH & WELFARE PLAN

THIS HEALTH and Welfare Plan is adopted by the Employer described in the Adoption Agreement of which this is a part.

Employer intends that the Plan and Trust qualify as a bona fide plan within the meaning of Section 2 of the Service Contract Act of 1965 (41 USC 351) and as an employee welfare benefit plan under Section 3(3) of ERISA (29 USC 1002). It is intended to comply with regulations established under laws such as the McNamara-O' Hara Service Contract Act (41USC 351, et seq.) Davis-Bacon Act (40 USC 276a-276a-7) Davis-Bacon and Related Acts, or prevailing or living wage laws or ordinances established by a state or political subdivision.

## I. DEFINITIONS

The following terms will have the indicated meanings for the Adoption Agreement, Plan, Trust and related documents unless otherwise indicated in those documents. Definitions set out in the Summary Plan Description are hereby incorporated by reference.

1.1 "Contracting Agency" shall mean any Federal, State, municipal or other contracting authority which has the power to require the Employer to pay specific fringe dollar amounts for Its Employees.

1.2 "Contribution" shall mean the Fringe Benefit Amounts, which Employer is required to pay for its Employees' benefits by the Contracting Agency, as amended from time to time. Contribution shall also mean the Fringe Benefit Amounts, which Employer is required to pay for its Employees' benefits by virtue of any Federal, State, municipal or other Ordinance or Statute, as amended from time to time. Contribution shall also mean amounts, which Employer is required to pay for its Employees' benefits, which are agreed upon between the Employer/Sponsor, Trustee and TPA for the Employees who are not governed or regulated by a Contracting Agency. Contribution shall also mean the total hourly, weekly or monthly actual or actuarially determined cost of Employee benefits, which may differ from the amount Employer is paying or is required to pay for its Employees.

1.3 "Earned Hours" shall mean the hours for an Employee which are required to be credited to that Employee by the Contracting Agency, Ordinance, Statute or agreement, to determine Fringe Benefit Amounts for the payroll periods in the month preceding the month in which Employer is required to make its Contribution.

1.4 "Earned Hours Record" shall mean Employee information necessary to support the Employer Contribution for Earned Hours and ascertain the appropriate level of Employee benefits under the Plan. This information shall include, but not be limited to, each Employee's name, social security number, date of hire, date of termination, Earned Hours, Fringe Benefit hourly rate and total Contribution for that Employee for the payroll periods relating to those Earned Hours.

1.5 "Employee" shall mean each common law employee of Employer who is employed under a Contract issued by a Contracting Agency, or who is otherwise



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

designated by Employer as a participant in the Plan. "Employee" shall also mean each common law employee of Employer who is employed under a Contract between Employer and another legal entity wherein certain Employer payroll related obligations are governed by any Federal, State, municipal or other Ordinance or Statute. "Employee" shall also mean each employee of an entity with whom Employer is providing services and for whom Employer has agreed to make contributions to Employer's Health and Welfare Plan in accordance with the Trust. This includes, but is not limited to, joint venture partner, prime contractor and sub-contractor relationships.

1.6 "Employer" means the employer described in the Adoption Agreement.

1.7 "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.

1.8 "Fringe Benefit Amounts" shall mean the dollar amount per hour, or other period, which Employer must contribute for each Employee under each applicable Contract.

1.9 "HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996, as amended.

1.10 "Insurer" shall mean the insurance company that provides benefits under the Plan through a policy of insurance.

1.11 "Plan" shall mean the Adoption Agreement, the related Plan document and all attachments and documents incorporated by reference.

1.12 "Plan Administrator" within the meaning of Section 3(16)(A) of ERISA shall mean the Employer.

1.13 "Service Contract" shall mean any contract under which Employer is required to provide employee services to a government agency or similar entity and for which Employer has adopted this Plan to satisfy Employer's fringe benefit obligations there under.

1.14 "SPD" shall mean the summary plan description for each New Group Information Sheet attached to and made a part of this Plan as an Exhibit A.

1.15 "Third Party Administrator" or "TPA" shall mean FCE Benefit Administrators, Inc., a California corporation, and any successor.

## II. PARTICIPATION

2.1 Eligibility. Employees will be eligible to become Participants in the Plan as of the date determined under the New Group Information forms which are attached as an exhibit hereto and may become Participants when Employer funds the Plan for that employee.

2.2 Cessation of Participation. All rights to receive benefits for claims of a Participant, and any spouse, Dependent or both of that Participant will terminate on the events and at the time described in the Summary Plan Description.

## III. BENEFITS



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

3.1 Benefits. Each Participant will be entitled to the benefits described in the Summary Plan Description, as amended from time to time under the Plan.

3.2 Exclusions. No reimbursement will be made for any expenses that are excluded under the Summary Plan Description.

## IV. PLAN ADMINISTRATION

4.1 Employer Responsibilities. Employer will have the authority to appoint a Third Party Administrator to administer the Plan unless Employer chooses to administer the Plan. If a Third Party Administrator is appointed, that Third Party Administrator will carry out the responsibilities of Employer which are specifically delegated to the Third Party Administrator under this Plan and the related Third Party Administrator Agreement.

4.2 Powers and Duties of Employer. Employer, acting through its Board of Directors and authorized officers, will have the power, in its sole and absolute discretion, to interpret and construe the provisions of the Plan, to supply omissions in the Plan, and to establish rules and regulations for the interpretation and administration of the Plan and transaction of its business, including but not limited to determining eligible Employees and Dependents and how benefits are determined. All these interpretive and administrative decisions, and rules and regulations, will be binding on all persons having an interest in the Plan.

4.3 Records and Reports. Except to the extent delegated to the Third Party Administrator under the Third Party Administrator Agreement, Employer will be responsible for keeping a record of all its proceedings and actions and will maintain all those books of account, records, and other data necessary to administer this Plan and to meet the disclosure and reporting requirements of ERISA.

4.4 Participant's Incapacity. If a physician, psychiatrist or other person satisfactory to Employer or Third Party Administrator certifies in writing that a person entitled to receive a payment under this Plan is under a legal disability, is a minor or is incapacitated in any other way so as to be unable to personally receive and give a valid receipt for any payment due him or her under the Plan, then Employer or Third Party Administrator may, unless a claim has been made by a duly appointed guardian, conservator or trustee for that person, make the payment of benefits to that person's spouse, child, parent or any other person deemed by Employer or Third Party Administrator to have incurred an expense for or assumed responsibility for the expenses of that person. Any payment made under this Section will be a complete discharge of any liability for making that payment under the provisions of this Plan.

4.5 Bonding. An ERISA bond or any other bond, as required by law, will be secured by this Plan.

4.6 Insurer Responsibilities. To the extent that any Plan benefits are provided by an Insurer under an insurance policy covering Employees of the Employer, the Insurer will have the power in its sole and absolute discretion to interpret the provisions of its insurance policy including, but not limited to, eligibility for coverage, eligibility for benefits, benefits amounts, decisions on appeals, and all other matters relating to such insurance policy. The Plan allocates to the Insurers' responsibility for administering the Plan's claims procedures and for exercising other fiduciary functions described in the



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

insurance policy issued by such Insurers, which also contain the rules for determining eligibility to participate in each insured program and eligibility to receive benefits under each insured program.

## V. CLAIMS PROCEDURES

5.1 Claims Procedures. All procedures for review of claims, claims denials and appeals of claims will be determined under the applicable Summary Plan Description.

## VI. CONTINUATION OF COVERAGE

6.1 Continuation Coverage. All notices and procedures for providing continuation of health coverage under the Plan to the extent required by applicable law will be determined under the applicable Summary Plan Description.

## VII. FUNDING POLICY

7.1 Funded Trust. Employer's payments from the Plan will be provided out of the trust fund under the Trust Agreement between Employer and Trustee.

## VIII. COMPLIANCE WITH PRIVACY STANDARDS

Certain members of the Employer's workforce perform services in connection with administration of the Plan. In order to perform these services, it is necessary for these employees from time to time to have access to Protected Health Information (as defined below). Under the Standards for Privacy of Individually Identifiable Health Information (45 CFR Part 164, the "Privacy Standards"), these employees are permitted to have such access in accordance with the following standards:

8.1 General. The Plan shall not disclose Protected Health Information to any member of Employer's workforce unless each of the conditions set out in this Amendment are met. "Protected Health Information" shall have the same definition as set out in the Privacy Standards but generally shall mean individually identifiable information about the past, present or future physical or mental health or condition of an individual, including information about treatment or payment for treatment.

8.2 Permitted Uses and Disclosures. Protected Health Information disclosed to members of Employer's workforce shall be used or disclosed by them only for purposes of Plan administrative functions. The Plan's administrative functions shall include all Plan payment functions and health care operations. The terms "payment" and "health care operations" shall have the same definitions as set out in the Privacy Standards, but the term "payment" generally shall mean activities taken with respect to payment of premiums or contributions, or to determine or fulfill Plan responsibilities with respect to



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

coverage, provision of benefits, or reimbursement for health care. "Health care operations" generally shall mean activities on behalf of the Plan that are related to quality assessment; evaluation, training or accreditation of health care providers; underwriting, premium rating and other functions related to obtaining or renewing an insurance contract, including stop loss insurance; medical review; legal services or auditing functions; or business planning, management and general administrative activities.

8.3 Authorized Employees. The Plan shall disclose Protected Health Information only to members of the Employer's workforce who are designated on Schedule I hereto and are authorized to receive such Protected Health Information, and only to the extent and in the minimum amount necessary for that person to perform his or her duties with respect to the Plan. For purposes of this Amendment, "members of the Employer's workforce" shall refer to all employees and other persons under the control of the Employer.

a. Updates Required. The Employer shall amend Schedule I promptly with respect to any changes in the members of its workforce who are authorized to receive Protected Health Information.

b. Use And Disclosure Restricted. An authorized member of the Employer's workforce who receives Protected Health Information shall use or disclose the Protected Health Information only to the extent necessary to perform his or her duties with respect to the Plan.

c. Resolution of issues of noncompliance. In the event that any member of the Employer's workforce uses or discloses Protected Health Information other than as permitted by this Amendment and the Privacy Standards, the incident shall be reported to the Plan's privacy officer. The privacy officer shall take appropriate action, including:

(1) Investigation of the incident to determine whether the breach occurred inadvertently, through negligence or deliberately; whether there is a pattern of breaches; and the degree of harm caused by the breach;

(2) Appropriate sanctions against the persons causing the breach which, depending upon the nature of the breach, may include oral or written reprimand, additional training, or termination of employment;

(3) Mitigation of any harm caused by the breach, to the extent practicable; and

(4) Documentation of the incident and all actions taken to resolve the issue and mitigate any damages.

8.4 Certification of Employer. The Employer must provide certification to the Plan that it agrees to:

a. Not use or further disclose the information other than as permitted or required by the Plan documents or as required by law;

b. Ensure that any agent or subcontractor, to whom it provides Protected Health Information received from the Plan, agrees to the same restrictions



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

and conditions that apply to the Employer with respect to such information;

c. Not use or disclose Protected Health Information for employment-related actions and decisions or in connection with any other benefit or employee benefit plan of the Employer;

d. Report to the Plan any use or disclosure of the Protected Health Information of which it becomes aware that is inconsistent with the uses or disclosures permitted by this Amendment, or required by law;

e. Make available Protected Health Information to individual Plan members in accordance with § 164.524 of the Privacy Standards;

f. Make available Protected Health Information for amendment by individual Plan members and incorporate any amendments to Protected Health Information in accordance with § 164.526 of the Privacy Standards;

g. Make available the Protected Health Information required to provide an accounting of disclosures to individual Plan members in accordance with § 164.528 of the Privacy Standards;

h. Make its internal practices, books and records relating to the use and disclosure of Protected Health Information received from the Plan available to the Department of Health and Human Services for purposes of determining compliance by the Plan with the Privacy Standards;

i. If feasible, return or destroy all Protected Health Information received from the Plan that the Employer still maintains in any form, and retain no copies of such information when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible; and

j. Ensure the adequate separation between the Plan and members of the Employer's workforce, as required by § 164.504(f)(2)(iii) of the Privacy Standards and set out in Section 1.3 hereof.

## IX. AMENDMENT AND TERMINATION

9.1 Employer Right to Amend or Terminate. Employer reserves the right to amend or terminate in whole or in part any or all of the provisions of this Plan, provided that the amendment or termination is permissible under applicable law and the amendment or termination will not affect a claimant's rights to benefits with respect to reimbursable expenses that have been incurred prior to the date Employer action is taken to terminate the Plan or the effective date of such termination, whichever occurs last. Such amendment or termination shall be made by a party authorized to act on behalf of Employer, which action shall be written. No amendment to the Plan will change any term or condition of any other related document included in the Adoption Agreement without the written consent of TPA.

9.2 Mandatory Amendments. Notwithstanding the provisions of this Article, or of any other provisions of this Plan, any amendment may be made, retroactively if necessary, which Employer or Third Party Administrator deems necessary or appropriate

to conform this Plan to, or satisfy the conditions of, any law, government regulation or ruling, and to permit this Plan to meet the requirements of applicable law.

9.3 Termination. Employer reserves the right at any time to terminate this Plan by delivering to Employees written notice of termination.

## X. MISCELLANEOUS

10.1 Participant's Rights. Neither the establishment of this Plan, nor any modification of it, nor the payment of any benefits, will be construed as giving to any Participant or other person any legal or equitable right against Employer or any of its officers, employees or agents, except as provided in this Plan. Under no circumstances will the terms of employment for any Participant be modified or in any way affected by this Plan.

10.2 Governing Law. Subject to ERISA or other applicable federal law, this Plan will be construed under the laws of the State of California.

10.3 Binding on All Parties. Any final judgment which is not appealed or appealable that may be entered in any legal action or proceeding will be binding and conclusive on the parties to that action or proceeding, Employer, and all persons having or claiming to have an interest under this Plan.

10.4 Headings. The headings of this Plan are inserted for convenience of reference only, and are not to be considered in the construction or the interpretation of this Plan.

10.5 Severability of Provisions. If any provision of this Plan is held to be invalid or unenforceable, that invalidity or unenforceability will not affect any other provision, and this Plan will be construed and enforced as if that provision had not been included.

10.6 Nonassignability. The rights, interests and benefits under this Plan may not be assigned or alienated by a Participant or Dependent in any manner except as specifically permitted under this Plan and will not be subject to execution, attachment or similar process.

10.7 Construction of Terms. All terms in the Plan include the feminine and neuter genders and all references to the plural include the singular and vice versa, as appropriate.

10.8 Integration of Plan Document. This document and the related Adoption Agreement and its attachments contain all of the operative provisions of this Plan. Any conflict between the provisions of those documents and any other Employer document purporting to explain the rights, benefits or obligations under the Plan will be resolved in favor of this Plan document.



© Copyright 2004 FCE Benefit Administrators, Inc. All Rights Reserved

# Group Information Form

**Company Information**

| Legal Name: Midwest Transport, Inc. | | |
|---|---|---|
| Address: 205 S. Cross Street | | |
| City: Robinson, | State: IL | Zip Code: 62454 |
| Phone: 618 544 3399 | Fax: 618 544-3761 | |
| Federal Tax ID#: 71-0930845 | State of Incorporation: Delaware | |
| Contact #1: ED SMITH | Contact #2: CHRIS ULRICH | |
| Title: CFO | Title: RECEPTIONIST | |
| E-Mail: ESMITH@MWTRANSPORT.COM | E-Mail: CULRICH@MWTRANSPORT.COM | |

**Mail Enrollments/SPDs to:**

| Member | Corporate Headquarters | Contract Location |
|---|---|---|
| Attention: | Title: | |

**Mail ID Cards to:**

| Member | Corporate Headquarters | Contract Location |
|---|---|---|
| Attention: | Title: | |
| New ID Cards (New &Renewal Groups): | Yes | No |

**Contract Location**

| Location Name:: SAME | Code or Dept. #~: | |
|---|---|---|
| Address: | | |
| City: | State: | Zip Code: |
| Phone: | Fax: | |
| Contact #1: | Contact #2: | |
| Title: | Title: | |
| E-Mail: | E-Mail: | |
| Participation Date | Effective Date: | |
| # of Employees at the Location: | | |

**Contract Location**

| Location Name:: | Code or Dept. #~: | |
|---|---|---|
| Address: | | |
| City: | State: | Zip Code: |
| Phone: | Fax: | |
| Contact #1: | Contact #2: | |
| Title: | Title: | |
| E-Mail: | E-Mail: | |
| Participation Date | Effective Date: | |
| # of Employees at the Location: | | |

**Contract Location**

| Location Name:: | Code or Dept. #~: | |
|---|---|---|
| Address: | | |
| City: | State: | Zip Code: |
| Phone: | Fax: | |
| Contact #1: | Contact #2: | |
| Title: | Title: | |
| E-Mail: | E-Mail: | |
| Participation Date | Effective Date: | |
| # of Employees at the Location: | | |

**Company Data**

| | |
|---|---|
| Participation Date: 04/01/05 | Effective Date: 05/01/05 |
| Contract Anniversary Date: | Plan Number: 506 |
| Plan Type: | Limited Benefits & Major Medical Wrap |
| Plan Design: (Ltd) | Family |
| Total Eligible Employees: 712 | |
| Employer Contributions: 2.90 | |
| Plan Fringe Amount: 2.90 | |
| H & W Amount: 2.90 | Other: |
| Fringe Increase From: | Date: |
| Funding Type: Fringe Rate Plan | |

**Waiting Period – Initially Eligible Group**

1st of the month following 30 days of obligated contributions

**Coverage Ends – Initially Eligible Group**

Midnight of the last day of the month of termination

**Waiting Period – Subsequently Eligible Employees**

1st of the month following 30 days of obligated contributions

**Coverage Ends – Subsequent Eligible Employees**

Midnight of the last day of the month of termination

**Broker / Consultant Information**

| | | |
|---|---|---|
| Name: Carol Pelak | | E-Mail: carolpelak@verizon.net |
| Address: 31727 Klarer Lane | | |
| City: Temecula, | State: CA | Zip Code: 92591 |
| Phone: 800-795-5534 | | Fax: 800-325-5534 |
| | | |

**Notes**

| |
|---|
| |
| |
| |

Employer verifies that the information provided on this Group Information Form is correct.

Midwest Transport, Inc.

By: [signature]

Title: President

Date: March 30, 2005

EXHIBIT 'B'
TO
THE HEALTH AND WELFARE PLAN

PLAN SPONSOR CERTIFICATION
FOR
COMPLIANCE WITH PRIVACY STANDARDS

Employer Sponsor of the Plan certifies that the Plan complies with the Standards for Privacy of Individually Identified Health Information (45 CFR Part 164, the "Privacy Standards").

**Midwest Transport, Inc.**

Signature: [signature]

Name: Ken Hohlbaugh

Title: President

Date: March 3rd 2005

SCHEDULE 'I'

Under this schedule, the Employer Sponsor of the Plan shall designate by job classification/title those members of the employer's workforce who are authorized to receive Protected Health Information to the extent and in the minimum amount necessary for that person to perform his or her duties with respect to the Plan.

| Job Classification/Title | |
|---|---|
| KEN HOHLBAUGH | PRES. |
| BARB HOHLBAUGH | CEO |
| ED SMITH | CFO |
| MARIE RELIHAN | COO |
| JOHN ELMORE | LEGAL |
| TERESA GOLDMAN | PAYROLL SUPV. |
| | |
| | |

EXHIBIT 'C'
TO
THE HEALTH AND WELFARE PLAN

BUSINESS ASSOCIATE AGREEMENT
FOR
COMPLIANCE WITH PRIVACY STANDARDS

**The Plan ("Covered Entity" Within the Meaning of the Privacy Standards)**

Name: Midwest Transport, Inc. Health and Welfare Plan

**The Claim Administrator ("Business Associate" Within the Meaning of the Privacy Standards)**

Name: FCE Benefit Administrators, Inc.
Address: 887 Mitten Road, Suite 200
Burlingame, CA 94010-1303

1.1 Intent.

The purpose of this Agreement is to set out the rights and responsibilities of the parties under the Standards for Privacy of Individually Identifiable Health Information under the Health Insurance Portability and Accountability Act (the "Privacy Standards") which takes effect April 14, 2004. The intent is to provide the protections required by the Privacy Standards, but to retain for the parties the greatest latitude and flexibility permitted under those standards in order to facilitate the prompt and efficient provision of services under this Agreement. The terms of this Agreement shall be interpreted and applied consistent with this intent and with the Privacy Standards.

As used in this Agreement, "Protected Health Information" has the meaning set out in the Privacy Standards; generally, Protected Health Information means information about an individual's health, including information about payment for health care, and which either identifies the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual. For purposes of this Agreement, Protected Health Information shall refer only to Protected Health Information received from the Plan or created or received by the Claims Administrator on behalf of the Plan. Terms used, but not otherwise defined, in this Agreement shall have the same meaning as those terms in 45 CFR 160.103 and 164.501.

1.2 Permitted Uses and Disclosures.

(a) The Plan may disclose Protected Health Information to the Claims Administrator (hereafter referred to as Business Associate) for purposes of treatment, payment, health care operations and data aggregation (all as defined by the Privacy Standards) and, subject to the terms of this Agreement, the Claims Administrator shall be permitted to use and disclose such Protected Health Information for these purposes.

(b) The Claims Administrator shall use or disclose the Protected Health Information only as authorized by this Agreement or as required by law, and shall not use or disclose the Protected Health Information in a manner that would violate the Privacy Standards if the use or disclosure were made by the Plan itself.

(c) However, the Claims Administrator may use and disclose Protected Health Information to the extent necessary for the proper management and administration of its own business or to carry out its legal responsibilities; provided that any disclosure made for these purposes shall be made only if: (1) it is required by law, or (2) the Claims Administrator obtains reasonable assurances from the person to whom the information is disclosed that (a) the Protected Health Information will be held confidentially and used or disclosed only as required by law or for the purpose for which Claims Administrator disclosed it to such person, and (b) the person will notify the Claims Administrator if it becomes aware of any instance in which the confidentiality of the information is breached.

1.3 Responsibilities of the Plan.

(a) The Plan shall establish written practices and procedures for the use and disclosure of Protected Health Information in accordance with the Privacy Standards and shall provide the Claims Administrator with copies of all such practices and procedures. The Plan shall promptly provide the Claims Administrator with copies of any amendments or updates of such practices and procedures. Without limitation, the Plan shall provide the following:

(1) A copy of the Plan's Notice of Privacy Practices and all amendments.

(2) A copy of the Plan's procedures and protocols that establish standards limiting the amount of Protected Health Information that may be disclosed to or requested from the Claims Administrator to the amount reasonably necessary to achieve the purpose of the use or disclosure.

(3) To the extent it may affect the Claims Administrator's duties under this Agreement, documentation of any restrictions to the use or disclosure of Protected Health Information to which the Plan has agreed in accordance with the Privacy Standards.

(4) To the extent it may affect the Claims Administrator's duties under this Agreement, documentation of any changes in, or revocations of, permission to use or disclose Protected Health Information by the individual who is the subject of the Protected Health Information.

(b) The Plan shall not request or authorize the Claims Administrator to use or disclose Protected Health Information in any manner that would not be permissible under the Privacy Standards if done by the Plan; provided, the Plan may request that the Claims Administrator provide data aggregation services. Without limitation, the Plan shall not request or authorize the Plan to disclose Protected Health Information:

(1) To employees of the sponsor of the Plan unless the Plan has received proper certification that the Plan documents have been amended as required by the Privacy Standards and the Plan sponsor has agreed to the restrictions imposed by the Privacy Standards. The Plan shall provide the Claims Administrator with a written list of the employees of the Plan sponsor and other individuals under the Plan sponsor's control who are engaged in administrative functions for the Plan and who are authorized to have access to Protected Health Information. Claims Administrator shall provide Protected Health Information only to those listed individuals. The Plan shall promptly provide any updates to the list.

(2) To agents or subcontractors of the Plan sponsor unless such agent or subcontractor has entered into an agreement subjecting the agent or subcontractor to the same restrictions and conditions respecting the Protected Health Information that apply to the Plan sponsor. The Plan shall provide the Claims Administrator with a written list of such agents and subcontractors who have entered into such agreements, and Claims Administrator shall provide Protected Health Information only to those entities. The Plan shall promptly provide any updates to this list.

(3) To any business associate unless a business associate contract is in effect in accordance with the Privacy Standards. The Plan shall provide the Claims Administrator with a written list of these business associates and other agents and subcontractors of the Plan sponsor who are authorized to have access to Protected Health Information. Claims Administrator shall provide Protected Health Information only to those listed entities. The Plan shall promptly provide any updates to the list.

(4) In excess of the minimum necessary standards established pursuant to Section 1.3(a) hereof.

(c) The Claims Administrator is entitled to rely on any request or authorization by the Plan to use or disclose PHI as being made in accordance with the terms of this Section 1.3, but reserves the right to refuse to disclose Protected Health Information in its sole discretion if it reasonably believes that such disclosure may result in a violation of the Privacy Standards.

**1.4 Unauthorized Uses and Disclosures.**

In the event the Claims Administrator becomes aware of an unauthorized use or disclosure of Protected Health Information by itself or any of its agents or subcontractors, the Claims Administrator shall promptly notify the Plan, in writing, of such unauthorized use or disclosure. The Plan and the Claims Administrator agree to act together in good faith to take reasonable steps to investigate and mitigate any harm caused by such unauthorized use or disclosure.

**1.5 Appropriate Safeguards.**

The Claims Administrator agrees that it will use appropriate safeguards to prevent the use or disclosure of Protected Health Information in any manner not authorized by this Agreement or applicable law.

**1.6 Agreements with Agents and Subcontractors.**

The Claims Administrator shall require each of its agents and subcontractors to which it discloses Protected Health Information to enter into a contract which requires compliance with the same restrictions and conditions that apply to the Claims Administrator under this Agreement. Claims Administrator shall provide to the Plan, upon request, a written list of these agents and subcontractors.

**1.7 Availability of Records and Information.**

The Claims Administrator shall make Protected Health Information and its records available to the extent necessary to comply with the Privacy Standards requirements to provide access to individuals upon request; to permit an individual to amend his records; to permit accounting of disclosures; or to comply with the terms of an audit by the Health and Human Services, all as set out below. Any such access shall be provided within 60 business days of receipt of written request by an authorized person, and shall be provided during normal business hours.

(a) Upon receipt of written instruction by the Plan, Claims Administrator will provide access to Protected Health Information in a designated record set to the Plan or to the individual to whom the Protected Health Information pertains, provided the Plan certifies that such disclosure is in accordance with the individual's right under the Privacy Standards to have access to his own Protected Health

Information. If the Plan determines, and notifies the Claims Administrator in writing, that the Protected Health Information is subject to amendment in accordance with the Privacy Standards, the Claims Administrator shall make any amendments to such Protected Health Information requested by the Plan or by such individual within 60 days following receipt of the Plan's written instruction.

(b) Upon receipt of written instruction by the Plan, Claims Administrator will provide an accounting within 60 days of any disclosures made with respect to an individual's Protected Health Information during the preceding six years to the extent required by the Privacy Standards. Claims Administrator shall only be responsible to account for any disclosures made by it, its agents and subcontractors. Claims Administrator shall not be responsible to account for any disclosures made by other entities that may be reflected in its records.

(c) Claims Administrator will make its privacy practices, books and records, as they apply to the Protected Health Information, available to the extent necessary to comply with an audit by the Secretary of Health and Human Services in accordance with the Privacy Standards.

**1.8 Termination of Contract.**

Notwithstanding any other conditions on termination of this Agreement, the Plan may terminate this Agreement if the Claims Administrator engages in a pattern of activity or practice that constitutes a material breach of its obligations under this Agreement.

Upon termination of this Agreement, the Claims Administrator shall return or destroy all Protected Health Information then in its possession which was received from, or created or received by, the Claims Administrator on behalf of the Plan, and shall not retain any copies of such Protected Health Information; provided, if return or destruction is not feasible, the Claims Administrator agrees to extend the protections of this Agreement to the Protected Health Information and limit further use and disclosure to those purposes that make the return or destruction infeasible. The Claims Administrator may charge a fee if it is required to maintain any such records following termination of this Agreement.

**1.9 Miscellaneous**

(a) *Regulatory References.* A reference in this Agreement to a section in the Privacy Rule means the section as in effect or as amended, and for which compliance is required.

(b) *Amendment.* The Parties agree to take such action as is necessary to amend this Agreement from time to time as is necessary for Plan to comply with the requirements of the Privacy Rule and the Health Insurance Portability and Accountability Act, Public Law 104-191.

(c) *Survival.* The respective rights and obligations of Business Associate under Section 1.8 of this Agreement shall survive the termination of this Agreement.

(d) *Interpretation.* Any ambiguity in this Agreement shall be resolved in favor of a meaning that permits the Plan to comply with the Privacy Rule.

(e) *Indemnification.* The Plan hereby agrees to indemnify, defend and hold harmless the Claim Administrator, its officers, members, agents, employees, contractors, and personnel from and against any and all claims, demands, suits, actions, losses, expenses, costs (including reasonable attorney fees), obligations, damages, deficiencies, causes of action, and liabilities (collectively "Claims") incurred by the Plan as a result of, or that are proximately caused by, (i) any breach of the duties and obligations of the Claim Administrator hereunder, including, employees, subcontractors or agents, and (ii) any act or conduct of the Claim Administrator, its employees, subcontractors or agents, adjudged to constitute fraud, misrepresentation or violation of any law, including without limitation, violation of any statute or regulation applicable to the Claim Administrator pursuant to this Agreement.

**FCE Benefit Administrators, Inc.**

**(Claims Administrator)**

Authorized Signer: [signature]

Name: Gary Beckman

Date: 2/23/05

**Midwest Transport, Inc. Health and Welfare Plan**
**(Plan)**

Authorized Signer: [signature]

Name: Ken Hohlbaugh

Date: 3-03-05

EXHIBIT 'D'
TO
THE HEALTH AND WELFARE PLAN

FUNDING POLICY
FOR
THE HEALTH & WELFARE PLAN
OF
MIDWEST TRANSPORT, INC.

Midwest Transport, Inc., as the sponsoring employer ("Employer") hereby makes this Funding Policy, effective as of April 1, 2005, under Section 2.3 of the Trust Agreement ("Trust") for the Health & Welfare Plan ("Plan") of Employer to implement the funding policy required under Section 2.3 of the Trust. The principal purpose of this Funding Policy is to insure that the Trust will have sufficient, readily available liquid assets in order to meet its obligations for payments required under the Plan and Trust.

The Plan will provide medical, dental, vision and related health and welfare benefits for certain eligible employees of Employer and their eligible dependents. Employer sponsor of the Plan will make periodic contributions to the Plan to fund those benefits generally as health and welfare expenses are incurred. Because the primary purpose of the Plan is to provide short-term health and welfare benefits, the primary investment strategy to be followed by the Trustee must stress the short-term liquidity needs and short-term stability of Trust assets.

Trustee will therefore invest the contributions of the Employer in such a manner so as to ensure security of Trust assets and provide sufficient liquidity necessary to meet the benefit payment requirements for administration of the Plan. Based on the above, the Funding Policy will be for Trustee to maintain the Trust's assets in short term, low-volatility investments including but not limited to money market accounts, interest bearing and non-interest bearing bank accounts, short term certificates of deposits and short term investment accounts.

Employer reserves the right to change this Funding Policy on 30 days' prior written notice to Trustee.

| (For Express Scripts Internal Use) |
|---|
| DIV #:_____ |
| BPL:_____ |
| GROUP #:_____ |
| SALES DIRECTOR:_____ |
| INDUSTRY TYPE:_____ |

EXHIBIT A
FORM OF CLIENT AGREEMENT

Client Name: Midwest Transport, Inc.
Client Tax ID Number: 71-0930845
TPA Name: FCE Benefit Administrators, Inc.
Broker Name: N/A
Purpose of Client Agreement: ☒ New Case ☐ Change In Prescription Drug Program (Effective Date of Change):_____
Initial Term of Client Agreement: (If New Case): From 5/01/05 to _____
Contact Information:

| | Client Information | TPA Information | Broker Information |
|---|---|---|---|
| Contact Person: (Name & Title) | Ken Hohlbaugh | Diane Lapin | N/A |
| Company Name: | Midwest Transport, Inc. | FCE Benefit Administrators, Inc. | |
| Street Address: | 205 South Cross Street | 887 Mitten Road | |
| City/State/Zip Code: | Robinson, IL 62454 | Burlingame, CA 94010 | |
| Phone Number: | | 650-341-0306 | |
| Fax Number: | | 650-341-7432 | |

Reporting: ☒ Management Reports
Party to receive Management Reports? ☒ TPA ☐ Client ☐ Broker Person's Name:_____

Payor: The party that will be responsible for payments to ESI under the Prescription Drug Program will be:
☐ TPA ☒ Client Through Its Health & Welfare Plan

If no party is selected, Client shall be deemed "Payor" by default

Medium on which invoice is to be sent (check one or two): ☐ Hard Copy (and) ☐ Magnetic Tape (or) ☒ Diskette

Do you want Member names to appear on Billing Statement? ☒ Yes ☐ No

TERMS AND CONDITIONS OF SERVICE

ESI and TPA have entered into a certain Managed Prescriptions Drug Program Agreement ("PBM Agreement"), which sets forth certain terms and conditions associated with ESI's provision of pharmacy services under this Client Agreement. To the extent not defined herein, capitalized terms shall have the meaning ascribed to them in the PBM Agreement. Prior to the provision of services hereunder, Client shall complete, execute and return to ESI an Express Scripts benefit design summary form ("EBD"), which describes the Client's essential elements of its prescription drug program adopted by Client. Client agrees to be bound by the completed EBD and this Client Agreement.

1. Clinical Programs; Medication Management. The provision of the Base Clinical Programs and the Supplemental Clinical Programs (and the election and substitution by Client thereof) shall be in accordance with ESI's then current terms and requirements for such programs, which are subject to change from time to time by ESI at its discretion. In all cases with respect to programs, the prescribing physician, in consultation with the Member, shall have final authority over the drug that is dispensed to the Member.

(a) Drug Utilization Review (DUR). ESI's DUR processes, including any supplemental retrospective programs elected by Client, are educational programs designed to enhance information available to the prescriber or the dispensing pharmacist, and are based only on the current claim for Covered Drugs and such Member information as has been previously provided to ESI and is available in ESI's on-line claims processing system. Furthermore, the DUR processes depend, in part, on clinical drug data and information on dispensing practices provided to ESI by third-party vendors, and is limited to certain drugs and certain analytical criteria that are established by ESI from time to time. ESI's DUR processes are not intended to substitute for the professional judgment of the prescriber, the dispensing pharmacist or any other health care professional providing services to the Member. Accordingly, notwithstanding anything to the contrary herein, ESI assumes no liability to Client, TPA or any other person in connection with the DUR process, including, without limitation, the failure of the DUR process to identify a prescription that results in injury to a Member.

(b) Prior Authorization. Prior authorized drugs must meet TPA or Client-approved guidelines ("Guidelines") before they are deemed to be Covered Drugs except that Client authorizes ESI to approve coverage for an otherwise excluded event of co-morbidities, complications and other factors not otherwise expressly set forth in the Guidelines. In determining whether to authorize dispensing of such drug under the PA program, ESI shall apply only the Guidelines and may rely entirely upon information about the Member and the diagnosis of the Member's condition provided to it from sources deemed reliable to ESI at the time that the prescription is to be dispensed. Client acknowledges that prior authorization programs are based on objective criteria and the limited amount of patient information available to ESI. ESI shall not undertake, and is not required hereunder, to determine medical necessity, to make diagnoses or substitute ESI's judgment for the professional judgment and responsibility of the physician. Appeals and final determinations to confirm or override a denial shall not be conducted by ESI.

(c) Authorization to Contact. Client represents to ESI that it has or shall obtain Member consents or authorizations required under applicable law, if any, for ESI to perform the services provided for under this Client Agreement. Subject to the restrictions set forth in Section 5 hereof, Client agrees to permit ESI to contact Members, Members' physicians and Participating Pharmacies to support and administer the Base Clinical Programs and Supplemental Clinical Programs adopted by Client hereunder, including, but not limited to, Drug Choice Management. Client, or TPA on behalf of Client, shall provide ESI with Members' addresses and such other information as may be reasonably necessary to facilitate such communications. In all cases the prescribing physician shall have final authority over the drug that is dispensed to the Member.

2. Participating Pharmacies.

(a) Mail Service Pharmacy. If selected in the EBD, Members may have prescriptions filled through the ESI Mail Service Pharmacy. Upon presentation of a prescription by a Member, the ESI Mail Service Pharmacy shall determine whether the Member is eligible under the Prescription Drug Program and whether the prescription is for a Covered Drug. Prescriptions will be dispensed from the Mail Service Pharmacy in a quantity not to exceed a 90-day supply unless otherwise specified in the EBD. In addition, if the prescription and applicable law do not prohibit substitution of a generic drug equivalent to the prescribed drug, or if prescriber consent is obtained, the Mail Service Pharmacy shall dispense the generic substitute. The Mail Service Pharmacy shall charge and collect from each Member the applicable Copayment, and/or any Deductible based on the plan design selected in the EBD. Refill reminders and on-line ordering shall be available to Members. ESI may promote the use of the ESI Mail Service Pharmacy to Members through coupons or other financial incentives at ESI's cost, subject to applicable law.

(b) Specialty Pharmacy. If Specialty Injectables are Covered Drugs under the particular Prescription Drug Program, Members may have Specialty Injectables filled through the Specialty Pharmacy. Specialty Injectable prescriptions received by the ESI Mail Service Pharmacy will be properly transferred to the Specialty Pharmacy for dispensing. Upon presentation of a prescription by a Member, the Specialty Pharmacy shall promptly determine whether the Member is eligible under a Prescription Drug Program and whether the prescription is for a Covered Drug. Specialty Injectables and supplies shall be shipped via overnight courier to the Member or physician within two (2) business days of receipt of a prescription and any follow-up physician clarification. The Specialty Pharmacy shall charge and collect from each Member the applicable Copayment and/or any Deductible (or portion thereof) based on the Client Agreement plan design.

(c) Participating Pharmacies. Upon presentation of an ID Card, Members may obtain prescriptions for Covered Drugs through the Participating Pharmacy network selected by Client in the EBD. An updated list of Participating Pharmacies in the applicable network shall be available on-line. Any additions to or deletions from the network shall be in ESI's sole discretion. Each Participating Pharmacy is required to verify the Member's eligibility through ESI's on-line claims processing system. Participating Pharmacies will dispense prescriptions to Members in a quantity not to exceed a monthly supply unless otherwise specified in the EBD. ESI shall direct the Participating Pharmacy to charge and collect the applicable Copayment and/or any Deductible (or portion thereof) from Members for each Covered Drug dispensed; provided that a Member's Copayment for a Covered Drug shall be the lesser of the applicable Copayment set forth in the EBD, or the U&C.

(d) Requirements for Participating Pharmacies. ESI shall require each Participating Pharmacy to meet ESI's participation requirements, including, but not limited to, licensure, insurance and provider agreement requirements. Participating Pharmacies are independent contractors of ESI. ESI does not direct or exercise any discretion or control over, and, notwithstanding anything to the contrary herein, ESI shall not be liable for any liability relating to, the professional judgment exercised by any pharmacist or employee of a Participating Pharmacy in dispensing prescriptions or otherwise providing pharmaceutical related services at a Participating Pharmacy.

(e) Pharmacy Help Desk. In addition, ESI will provide 24-hour a day toll-free telephone support and internet web-site to assist Participating Pharmacies with Member eligibility verification and questions regarding reimbursement, Covered Drug benefits under the Prescription Drug Program, or other related concerns.

(f) Pharmacy Audits. To compensate ESI for the cost of conducting audits, ESI shall retain an audit fee from any recovered overpayments detected in the audit in the amount set forth on Exhibit B of the PBM Agreement, unless such overpayment was due to a set-up error by ESI. The balance of any such overpayments will be paid to TPA on behalf of the Client or offset against future amounts due by Payor. TPA covenants that it will pass through to Client its allocable share, if any, of such recoveries, unless TPA and Client have agreed in writing to a different arrangement. ESI shall attempt recovery of overpayments through offset or demand of amounts due. ESI shall not be required to institute litigation to recover any overpayments.

3. Claims Processing.

(a) On-Line Claims Processing. ESI will perform claims processing services for Covered Drugs dispensed by a Participating Pharmacy, Mail Service Pharmacy or Specialty Pharmacy. Such services include (i) verifying eligibility; (ii) calculating benefits in accordance with the Client Agreement; (iii) performing clinical programs as described above; and (iv) adjudicating Prescription Drug Claims. In all cases, the Client shall have the final responsibility for all decisions with respect to coverage of the Prescription Drug Program and the benefits allowable thereunder, including determining whether any rejected or disputed claim shall be covered.

(b) Member-Submitted Claims. If selected in the EBD, ESI shall process Member-Submitted Claims. The Member (or Medicaid agency, as the case may be) shall be responsible for submitting such claims directly to ESI on a form provided by ESI within the time period set forth in the EBD. ESI shall reimburse such Member or agency on behalf of Payor, the lesser of (i) the amount invoiced by the agency or Member, or (ii) the amount ESI would have reimbursed a Member for such claim in accordance with the Client Agreement. Payor shall reimburse ESI for all amounts paid for Member Submitted Claims under this Section and the applicable Member Submitted Claim administrative fee set forth in Exhibit B of the PBM Agreement.

(c) Coordination of Benefits. ESI shall make reasonable efforts to coordinate benefits with Medicare, Medicaid or any other similar federal or state governmental program when Medicare, Medicaid or any similar program is primary for Members' coverage. TPA or Client shall provide ESI with sufficient information about a Member's primary coverage to enable ESI to administer the coordination of benefits process.

(d) Claims for Benefits. ESI agrees that the processing of initial claims for benefits for Member Submitted Claims and prior authorization requests shall be conducted by ESI in a manner consistent with the requirements for claim processing set forth in 29 CFR Part 2560 (as published in the Federal Register, November 21, 2000), except that Client (or TPA, if the function is delegated by Client to TPA) shall be responsible for ensuring compliance with any aspect of the requirements relating to functions performed, or materials prepared, by TPA, Client or any other third party.

(e) Appeals. ESI will not conduct any appeals of denied "claims for benefits" (as that term is defined in 29 CFR Part 2560). However, if Client does not desire to conduct appeals itself, Client may elect to have ESI facilitate appeals through a third-party contractual relationship ESI maintains with an independent, third party utilization management company ("UM Company"). The UM Company has agreed to conduct appeals on behalf of self-insured ERISA plans doing business with ESI. If Client has elected to have Member appeals facilitated through ESI, so long as ESI maintains its contractual relationship with the UM Company, Member appeals received by ESI will be routed directly to the UM Company. The UM Company will be responsible for conducting the appeal on behalf of the Client in accordance with applicable law, and if an appeal is denied, the UM Company will be responsible for sending a denial letter to the Member in accordance with applicable law. Payor will be responsible for paying ESI the appeal fees described in Exhibit B of the PBM Agreement. Client acknowledges and agrees that: (a) the UM Company, and not ESI, will be conducting appeals on behalf of Client; (b) the UM Company is an independent contractor of ESI, and ESI does not in any way control or direct the UM Company with respect to appeals conducted by the UM Company; (c) ESI is not acting as a fiduciary in connection with the appeals being conducted by the UM Company, and ESI shall not be named by Client as a fiduciary in connection with such appeals; (d) ESI shall not be responsible for overseeing the UM Company's appeal process (except that ESI shall require the UM Company to contractually agree that it will conduct appeals in accordance with applicable law), and ESI shall not be liable for any injury or damages arising as a result of the UM Company's negligence or otherwise; (e) the UM Company shall have full authority to conduct appeals for which it has been designated by Client and the UM Company shall have full authority and discretion to interpret the terms of Client's plan with respect to those appeals and to make findings of fact with respect to such appeals, and the UM Company's determination on appeal shall be final and legally binding on all parties; (f) Client will indemnify ESI for any damages

resulting from Client's negligence, intentional wrongdoing, bad faith or fraud on the part of Client. In connection with appeals conducted by the UM Company; and (g) Client will forward to the UM Company all relevant plan language necessary for the UM Company to conduct appeals (current address is: MCMC, LLC., Attn: ESI ERISA Fiduciary Team, 88 Black Falcon Avenue, Suite 353, Boston, MA 02210).

4. Billing and Payments.

(a) Payor, as identified above, shall be responsible to ESI for timely payment of all Fees under the payment method elected above. ESI will bill Payor, weekly or twice per month, at ESI's discretion, for all applicable Fees. If TPA is Payor, Client shall remit amounts to TPA which are sufficient for TPA to meet the payment obligations herein. If TPA is Payor, TPA shall have third party beneficiary rights under this Client Agreement to enforce Client's obligation to remit amounts to TPA which are sufficient for TPA to meet such payment obligations herein.

(b) Payor shall pay all Fees within the following time period, depending on the form of payment:

- Payor wire transfer to a bank account designated by ESI within 7 days of receipt of ESI's bill (First Chicago NBD, A Bank One Company, One First National Plaza, Chicago, IL 60670-0196, Bank ABA#071000013, Account Name: Express Scripts, Inc., Account No. 10-16856).
- Payor ACH transfer based on its written authorization, initiated by ESI within 7 days of receipt of ESI's bill.
- A check received by ESI within 5 days of the date of receipt of ESI's bill.
- A check received by ESI within 15 days of the date of receipt of ESI's bill. ESI will add a charge of $0.10 per submitted claim for this payment option.

(c) Any Fees not paid by Payor on the due date set forth above shall bear interest at the rate of eighteen percent (18%) per annum (1.5% per month) or, if lower, the highest interest rate permitted by law ("Late Penalty"), and the Responsible Party shall be liable for payment to ESI of such Late Penalty. The Responsible Party shall promptly reimburse ESI for all collection costs and expenses incurred by ESI, including but not limited to attorneys' fees, in connection with attempting to recover overdue Fee payments. If Payor disputes any item on any invoice, Payor shall state the amount in dispute in writing within thirty (30) days of the date of the invoice. Payor shall pay the full amount owed by the applicable due date and shall notify ESI of the disputed amount. If, upon resolution of the dispute, it is determined that Payor is entitled to a refund of the disputed amount, ESI will promptly refund the disputed amount. For purposes of this Client Agreement, the "Responsible Party" shall be the Client, unless the Late Penalty or collection costs arise as a result of TPA's negligence or willful act or omission, as determined by ESI in good faith.

(d) Payor shall pay ESI for all claims for Covered Drugs dispensed to a Member on or before the later of (i) the date of the Member's termination, or (ii) the date three (3) business days after ESI receives notification of the Member's termination in an Eligibility File or other written notice, or the date one (1) business day after ESI receives such notification electronically. ESI shall not be responsible for ensuring the accuracy of the Eligibility Files, and shall be entitled to payment from Payor for claims accepted by ESI for Members shown as eligible on the date the claim was adjudicated. ESI shall not bear the risk of fraudulent claims submitted by Members or by unauthorized persons using a Member's ID Card or identification number, except in the event of ESI's negligence.

(e) In the event Payor is delinquent in payment of fees for two consecutive months, ESI shall have the sole option to require that the Client provide to ESI a deposit in an amount equal to the average monthly invoice amount for the previous three (3) months, or if there is less than three (3) months billing history, then such deposit shall be based on the average monthly invoice of the actual billing history. ESI shall retain the deposit until the termination of this Client Agreement. Any balance of such deposit or security remaining upon termination of the Client Agreement shall be promptly returned to Payor upon payment of all Fees due as of such termination following any run-off provisions. Any such deposit provided to ESI will be placed in ESI's general assets and Client represents that such deposit provided by Client will not be composed of, in whole or in part, employee contributions under Client's employee welfare benefit plan.

(f) Members shall be required to pay their applicable Copayments and/or Deductibles to ESI prior to the dispensing of a prescription through the ESI Mail Service Pharmacy. If selected in the EBD, Client shall have the option to bear responsibility for payment to ESI of any billed and unpaid Member Copayments and/or Deductibles in the event Client desires ESI to fill the Member's prescription without prepayment. If so, Payor shall pay these amounts.

(g) Payor shall pay ESI in accordance with this Client Agreement for all claims for Covered Drugs dispensed and services provided to Members on or before the effective date of termination of this Client Agreement ("Termination Date"). Claims submitted by Participating Pharmacies or Member-Submitted Claims filed with ESI after sixty (60) days from the Termination Date shall be processed and adjudicated in accordance with a mutually determined run-off plan. Notwithstanding the preceding, ESI may request that a Client pay a reasonable deposit in the event ESI is requested to process after the Termination Date claims incurred on or prior to such date by such Client's Members.

(h) In the event the PBM Agreement terminates prior to this Client Agreement, and TPA is selected as Payor hereunder, Client shall become Payor with respect to all Prescription Drug Claims. Notwithstanding anything to the contrary herein, in the event Payor is TPA and TPA defaults on any payment obligation, Client shall be responsible for immediate payment of all such outstanding amounts due.

5. Use of Records; HIPAA and Business Associate/Trading Partner Agreement Terms.

(a) Use of Prescription Drug Records. Client and ESI shall maintain the confidentiality of any Personal Health Information ("PHI") in accordance with any applicable laws and regulations. Client hereby represents and warrants to ESI that, as sponsor of a health plan, Client is legally entitled to provide PHI to ESI, either directly or indirectly through TPA, and to receive PHI relating to a Member's prescription drug utilization from ESI. All PHI, records, reports and other data provided by ESI to Client (either directly or indirectly through TPA) under this Client Agreement are solely for the treatment, payment and/or health care operation functions associated with Client's health plan, and ESI disclaims all liability arising out of Client's receipt, use or dissemination of such information, records, reports or data. Client grants ESI permission to use both during and after the term of this Client Agreement, and/or transfer to third parties, Member information that is de-identified in accordance with HIPAA for research, provider profiling and other databases for benchmarking, drug trend, cost analyses, cost comparisons or other business purposes of ESI and its affiliates.

(b) HIPAA and Business Associate/Trading Partner Agreement Terms. As required by the Health Insurance Portability and Accountability Act of 1996, as amended ("HIPAA"), ESI and Client's health plan agree to comply with the terms and conditions set forth in Attachment 1 hereto (the "Business Associate Agreement"). For purposes of the Business Associate Agreement only, Client is signing this Client Agreement on behalf of its health plan as a duly authorized signatory of the health plan.

(c) Claims Data Retention. Except as otherwise provided in the Business Associate Agreement attached hereto, ESI will maintain claims data supporting invoices for Covered Drugs adjudicated by ESI during the term of this Client Agreement for a period of twenty-four (24) months in their original forms, and thereafter on microfilm, microfiche or other form determined by ESI for an additional five (5) years. ESI shall use reasonable efforts to cooperate with Client for purposes of meeting Clients' Prescription Drug Program retention obligations under applicable law. After expiration of the retention period, ESI shall archive and then dispose of such data in accordance with its standard policies and practices and applicable state and federal law.

6. Proprietary Information. Each party agrees that information of the other party, including, but not limited to, the following, shall constitute confidential and proprietary information ("Proprietary Information") unless otherwise public: (a) with respect to ESI: reporting and system web-based applications, Express Choice, system formats, databanks, clinical or formulary management operations or programs, information concerning Rebates, prescription drug evaluation criteria, drug choice management, drug pricing information and Participating Pharmacy agreements; and (b) with respect to Client: Client and Member information files, business operations and strategies, are confidential and proprietary. Neither party shall use a party's Proprietary Information, or disclose it to any third party, at any time during or after termination of this Agreement, except as specifically contemplated by this Agreement or upon prior written consent or as otherwise required by law. Upon termination of this Agreement, each party shall cease using the other's Proprietary Information, and all such information shall be returned or destroyed at the owner's direction. ESI shall retain full ownership rights over all compilations, analyses and reports prepared by ESI (other than those reports prepared specifically for TPA or Client under Client's Prescription Drug Program).

7. Compliance with Law; Change In Law. Each party shall be responsible for ensuring its compliance with any laws and regulations applicable to its business, including maintaining any necessary licenses and permits. If Client's Prescription Drug Program is subject to the provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq., as amended ("ERISA"), Client shall ensure that its activities in regard to such program are in compliance with ERISA, and ESI shall not be deemed to be a fiduciary of such program. Client shall not name ESI as a fiduciary of its plan and Client acknowledges that ESI has no power to make any decisions as to plan policy, interpretations, practices or procedures, but rather provides administrative services within a framework of policies, guidelines, interpretations, rules, practices and procedures chosen by Client. Client acknowledges that ESI does not have discretionary authority or control respecting management of Client's plan and does not exercise any authority or control respecting management or disposition of the assets of Client's plan, if any exist. Client further acknowledges that all such discretionary authority is retained by Client or some other person or entity. ESI may pay a commission or other remuneration to TPA and/or a broker or a consultant in connection with this Client Agreement, which may vary based on plan design or other factors, and Client acknowledges and expressly consents to same. Information on such commission or other remuneration to TPA, if any, is set forth in the PBM Agreement. To the extent such commission or remuneration information necessary for Client to satisfy its duties under ERISA or other applicable law, including the duty to file annual reports, cannot be obtained by Client from TPA, ESI will provide such information to Client upon written request. Client shall be required to disclose any aspects of its Prescription Drug Program to Members or its health plan to the extent required by applicable law. Client shall be responsible for any governmental or regulatory charges imposed upon this Prescription Drug Program, other than taxes passed on the net income of ESI. If ESI's performance of its duties under this Client Agreement or the Prescription Drug Program is made materially more burdensome or expensive due to a change in federal, state or local laws or regulations or the interpretation thereof, the parties shall negotiate an appropriate adjustment to the fees paid to ESI. If the parties cannot agree on an adjusted fee, then ESI may terminate the Client's Prescription Drug Program on 30 days' prior written notice to Client. ESI shall have no obligation whatsoever to communicate the terms of the Prescription Drug Program to Members or provide Members with any documents required under ERISA (e.g., SPD) or other applicable law.

8. Disclosure of Certain Financial Matters. In addition to any administrative fees that may be paid to ESI pursuant to the PBM Agreement or this Client Agreement, ESI derives margin from fees and revenue in one or more of the ways described in the ESI Financial Disclosure to PBM Clients set forth in Attachment 2 hereto ("Financial Disclosure To ESI PBM Clients"). In negotiating any of the fees and revenues described in the Financial Disclosure to ESI PBM Clients or in this Client Agreement or the PBM Agreement, ESI acts on its own behalf, and not for the benefit of or as agent for the TPA, Client, Members or any employee welfare benefit plan. Except for the Rebate amounts to which TPA or Client are expressly entitled to receive, if any, as indicated in the fee exhibit of the PBM Agreement, TPA and Client each acknowledges and agrees that ESI will retain all interest, Rebate administrative fees, revenues, any portion of Rebates thereon, and all Participating Pharmacy discounts, if any, in addition to any administrative and other fees paid by TPA or Client to ESI. Client acknowledges for itself, its Members and its employee welfare plan(s) that, except as may be expressly provided herein, neither it, any Member, nor the plan(s), has a right to receive, or possesses any beneficial interest in, any such revenues, discounts or payments.

9. Rebates. TPA may have negotiated Rebate sharing with ESI in connection with the Rebate Program, and TPA may be retaining such Rebates. Information on such Rebate sharing, if any, is set forth in the PBM Agreement. All Rebates are subject to the terms and conditions set forth in the PBM Agreement.

10. Audits. Client shall have a right to audit ESI, provided any such audit shall be in accordance with, and subject to, ESI's standard audit protocol and the limitations imposed upon TPA with respect to an audit, as set forth in the PBM Agreement.

11 Term; Termination. The initial term of this Client Agreement is set forth on the first page of this Client Agreement, and is subject to automatic renewal for successive one year terms unless either ESI or Client gives notice to the other of its intention not to renew this Client Agreement at least thirty (30) days prior to the end of the then-current term of this Client Agreement, with such termination of this Client Agreement effective the last day of such then current term upon the provision of such notice. Notwithstanding the foregoing, upon written notice to Client, ESI may immediately terminate this Client Agreement, or immediately suspend its performance hereunder, if: (a) Client becomes insolvent or enters bankruptcy, (b) upon the commencement of a voluntary or involuntary case under Title 11 of the U.S. Code against Client, (c) Client makes a general assignment for the benefit of its creditors, (d) Client is unable to pay its debts hereunder as they become due, or (e) Client materially breaches this Agreement and does not cure such breach within thirty (30) days of receipt by Client of ESI's written notice of such breach. Upon written notice to ESI, Client may immediately terminate this Client Agreement if ESI materially breaches this Agreement and ESI does not cure such breach within thirty (30) days of receipt by ESI of Client's written notice of such breach.

12. Termination for Non-Payment. ESI may terminate or suspend its performance hereunder immediately and cease providing or authorizing provision of Covered Drugs to Members without written notice if Payor fails to pay ESI or provide a deposit, if required, in accordance with the terms of the PBM Agreement and this Client Agreement. ESI also may suspend Mail Service Pharmacy or Specialty Pharmacy Services to a Member who is in default of payment of any Copayments or Deductibles owed to such pharmacy. At any time, if ESI has reasonable grounds for insecurity as to the ability of Client (as well as TPA, if TPA is designated as Payor above) to meet its financial commitments hereunder (or the PBM Agreement) based on payment record, Payor's latest financial information or claims volume, ESI may require adequate assurance of Client's or TPA's future performance. If at any time during the term of this Client Agreement Client shall experience one unprofitable year, with profitability to be measured by a positive net profit, positive cash flow from operations, and an equity position equal to at least the value of ESI's receivable investment, or if ESI has reasonable grounds for insecurity as to the ability of Client to meet its financial commitments because of Client's published financial data or funding levels falling below regulatory requirements, or state or federal regulatory agency statements, findings or notice, ESI may require Client to provide security reasonably acceptable to ESI in accordance with its standard practices.

13. Indemnification.

(a) ESI will indemnify and hold Client harmless from and against any loss, cost, damage, expense or other liability, including, without limitation, reasonable costs and attorneys' fees ("Costs") incurred in connection with any and all third party claims, suits, investigations or enforcement actions ("Claims") which may be asserted against, imposed upon or incurred by Client and arising as a result of (i) ESI's negligent acts or negligent omissions or willful misconduct, (ii) ESI's breach of this Client Agreement, or (iii) Client's use of or access to any ESI proprietary reporting and on-line systems applications, unless TPA or Client has modified or altered the applications without ESI's written consent.

(b) Client will indemnify and hold ESI harmless from and against any Costs for Claims which may be asserted against, imposed upon or incurred by ESI and arising as a result of Client's (i) negligent acts or negligent omissions or willful misconduct, (ii) adopted benefit design, and coverage decisions by ESI in accordance with such benefit design, or (iii) breach of this Client Agreement.

(c) The indemnified party shall notify the indemnifying party in writing promptly upon learning of any Claim for which indemnification may be sought hereunder, and shall tender the defense of such claim to the indemnifying party and afford such indemnifying party with a reasonable opportunity to comment on such defense. No party shall indemnify the other party with respect to any claim settled without the indemnifying party's written consent, which shall not be unreasonably withheld.

14. Miscellaneous. This Client Agreement shall be binding upon, and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto. Except for the Business Associate Agreement, ESI may amend the Terms and Conditions (the "T&C") of this Client Agreement at any time upon written notice to Client (the "Notice"). If, however, Client objects to such amendment, Client shall have the right to object to such amendment by submitting a written objection within thirty (30) days of Client's receipt of ESI's Notice. In such event, the parties agree to negotiate in good faith a mutually acceptable amendment to the T&C and, if the parties cannot agree on such an amendment, then either party may terminate this Client Agreement upon sixty (60) days prior written notice to the other party. This Client Agreement shall be governed by and construed in accordance with the internal laws of the State of Missouri. This Client Agreement shall not be discharged or affected by any changes in, or termination of, the PBM Agreement except as otherwise expressly provided herein. This Client Agreement supersedes any previous Client Agreements between the parties hereto. The last sentence of Section 1(a) and 2(d), and Sections 4, 5, 6, 7, 8, 13 and 14 of this Client Agreement shall survive termination for any reason.

THE UNDERSIGNED AGREE THAT THIS CLIENT AGREEMENT ACCURATELY DESCRIBES THE PRESCRIPTION DRUG PROGRAM TO BE PROVIDED TO CLIENT. CLIENT FURTHER EXPRESSLY AGREES TO THE TERMS AND CONDITIONS SET FORTH IN THIS CLIENT AGREEMENT. CLIENT SHALL RECEIVE A COPY OF THE PBM AGREEMENT BETWEEN TPA AND ESI UPON REQUEST.

NAME OF CLIENT (PRINT): Midwest Transport, Inc. Date: March 1, 2005

By: [signature] Name: Ken Hohlbaugh Title: President
SIGNATURE (PRINT NAME)

EXPRESS SCRIPTS, INC., on behalf of itself and its subsidiaries

By:________________ Name:________________ Title:________________
SIGNATURE (PRINTED NAME)

IMPLEMENTATION OF THE PRESCRIPTION DRUG PROGRAM DETAILED HEREIN INCLUDING PAYMENT OF REBATES AND/OR COMMISSIONS, IF ANY, SHALL NOT BE INITIATED UNTIL THIS CLIENT AGREEMENT IS EXECUTED BY CLIENT AND ESI.

ATTACHMENT 1 TO CLIENT AGREEMENT

BUSINESS ASSOCIATE/TRADING PARTNER AGREEMENT

WHEREAS, ESI and Client are parties to that certain client agreement ("Client Agreement") to which this Business Associate/Trading Partner Agreement ("Business Associate Agreement") is attached; and

WHEREAS, Client sponsors a prescription drug plan (the "Plan"), which is an employee welfare plan (as defined in Section 3(1) of the Employee Retirement Income and Security Act of 1974, as amended), and which is subject to the Health Insurance Portability and Accountability Act of 1996, and its implementing regulations as set forth in 45 CFR Parts 160, 162 and 164 (collectively, the "HIPAA Rules"); and

WHEREAS, the HIPAA Rules require the Plan and ESI to enter into a "business associate agreement" and a "trading partner agreement" to comply with applicable sections of the HIPAA Rules as of the applicable Compliance Dates; and

WHEREAS, Plan and ESI agree that the following constitutes a business associate agreement and trading partner agreement for purposes of compliance with the HIPAA Rules relating to PHI and standard transactions.

TERMS OF AGREEMENT

1. Definitions. Capitalized terms not otherwise defined shall have the meaning ascribed to them in the HIPAA Rules or the Client Agreement, as applicable.

(a) "Compliance Date(s)" shall mean the date established by HHS or the United States Congress for effective date of applicability and enforceability of the HIPAA Rules. The Compliance Date for the privacy regulations is April 14, 2003, and for the standard transactions was October 16, 2002, unless either were extended in accordance with the law.

(b) "Member" means an Individual, participants, enrollees, subscribers, patients, insureds, employees and/or dependents of the Plan identified to ESI under the terms of the Client Agreement and PBM Agreement as eligible for the pharmacy benefit management services provided by ESI.

(c) "Protected Health Information" and "PHI" shall mean protected health information, as that term is defined under the HIPAA Rules.

2. General Use and Disclosure Provisions. ESI and the Plan acknowledge and agree as follows:

(a) Except as otherwise limited in this Business Associate Agreement, ESI may use and disclose PHI to properly provide, manage and administer the services required under the Client Agreement and the PBM Agreement (insofar as it relates to Client's prescription drug program) and, consistent with applicable law, to assist the Plan in its operations, as long as such use or disclosure would not violate the HIPAA Rules if done by the Plan. ESI will take reasonable efforts to limit PHI provided to any third party to the minimum necessary to accomplish the intended use or disclosure. ESI shall also be permitted to use PHI performing data aggregation services on behalf of the Plan, as permitted by 45 CFR 164.504(e)(2)(i)(B). ESI may also de-identify PHI in accordance with the HIPAA Rules, and use or disclose such de-identified information to the extent permitted by law. In addition, ESI may use or disclose PHI in any other manner consistent with a legally sufficient authorization executed by the Member or other individual who is the subject of such information. In addition, Client recognizes that certain brokers, consultants or auditors may from time-to-time be engaged by Client's TPA to perform certain treatment, payment and/or health care operation functions associated with the Plan and, as such, ESI may disclose PHI to such broker, consultant or auditor solely for such purposes provided Client's TPA represents and warrants to ESI that such broker, consultant or auditor agrees to be bound by the same terms and conditions set forth in the business associate agreement between the Plan and Client's TPA or by the terms and conditions set forth herein.

(b) Except as otherwise limited in this Business Associate Agreement, ESI may use and disclose PHI for the proper management and administration of ESI or to carry out ESI's legal responsibilities as follows:

i. ESI may use PHI in its possession for the proper management and administration of ESI or to carry out the legal responsibilities of ESI if such uses are permitted under applicable state and federal confidentiality laws.

ii. ESI may disclose PHI to third parties for the proper management and administration of ESI or to carry out the legal responsibilities of ESI, provided that the disclosures are Required by Law, or ESI obtains reasonable assurances from the person to whom the information is disclosed that it will remain confidential and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person, and the person notifies ESI of any instances of which it is aware in which the confidentiality of the information has been breached.

(c) The Plan acknowledges it has, or will have, entered into business associate agreements with any third parties (e.g., case managers, brokers or third party administrators) to which the Plan directs and authorizes ESI to disclose PHI.

(d) ESI agrees to promptly notify the Plan if ESI has knowledge that PHI has been used or disclosed by ESI in a manner that violates applicable law.

(e) ESI agrees to use appropriate safeguards, consistent with applicable law, to prevent use or disclosure of PHI in a manner that would violate this Business Associate Agreement. ESI shall provide the Plan with such information concerning such safeguards as the Plan may reasonably request from time to time.

(f) ESI agrees to mitigate, to the extent practicable, any harmful effect that is known to ESI of a use or disclosure of PHI by ESI in violation of this Business Associate Agreement.

(g) ESI agrees to ensure that any agent, including a subcontractor, to whom it provides PHI received from, or created or received by ESI on behalf of, the Plan agrees to the same restrictions and conditions that apply through this Business Associate Agreement to ESI with respect to such information.

(h) Within ten (10) business days of a request, ESI agrees to provide to the Plan or, as directed by the Plan, a Member, access to PHI in a Designated Record Set in order to meet the requirements under 45 CFR 164.524.

(i) Within ten (10) business days of a request from the Plan or subject Member, ESI agrees to make any appropriate amendment(s) to PHI in a Designated Record Set that the Plan directs or agrees to pursuant to 45 CFR 164.526.

(j) Within ten (10) business days of a proper request from the Plan or subject Member, ESI agrees to document and make available to the Plan or Member, for a reasonable cost-based fee, such disclosures of PHI and information related to such disclosures necessary to respond to such request for an accounting of disclosures of PHI, exclusive of those disclosures for payment, treatment or healthcare operations, in accordance with 45 CFR 164.528. ESI shall retain copies of any accountings for a period of six (6) years from the date the accounting was created.

(k) Within ten (10) business days of a request from the Plan, ESI agrees to restrict the use or disclosure of PHI agreed to by the Plan on behalf of an Individual in accordance with 45 C.F.R. 164.522.

(l) ESI agrees to make internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by ESI on behalf of, the Plan available to the Plan within ten (10) business days from the date of request, or at the request of the Plan or the Secretary of HHS ("Secretary"), to the Secretary in a time and manner directed by the Secretary, for purposes of the Secretary determining the Plan's compliance with the HIPAA Rules.

3. Plan Obligations.

(a) The Plan shall notify ESI of any limitation(s) in the notice of privacy practices of the Plan in accordance with 45 C.F.R. §164.520, to the extent that such limitation may affect ESI's use or disclosure of PHI.

(b) The Plan shall notify ESI of any changes in, or revocation of, permission by a Member to use or disclose PHI, to the extent that such changes may affect ESI's use or disclosure of PHI.

(c) The Plan shall notify ESI of any restriction to the use or disclosure of PHI that the Plan has agreed to in accordance with 45 C.F.R. §164.522, to the extent that such restriction may affect ESI's use or disclosure of PHI.

(d) The Plan shall not request that ESI use or disclose PHI in any manner that would exceed that which is minimally necessary under the HIPAA Rules or that would not be permitted by a Covered Entity.

4. Standard Transactions. The HIPAA Rules provide for certain transaction standards for transfer of data between trading partners. While certain of the standards may or may not be adopted by the Plan (e.g., for eligibility), ESI will be prepared to accept the following in accordance with 45 CFR Part 162.1502: ASC X12N 834 – Benefit Enrollment and Maintenance. The parties each hereby agree that it shall not change any definition, data condition or use of a data element or segment in a standard, add any data elements or segment to the maximum defined data set, use any code or data elements that are either marked "not used" in the standard's implementation specification or are not in the implementation specification, or change the meaning or intent of the implementation specification.

5. Breach; Termination.

(a) Without limiting the termination rights of the Client and ESI pursuant to the Client Agreement, upon the Plan's knowledge of a material breach by ESI of this Business Associate Agreement, the Plan shall notify ESI of such breach and ESI shall have thirty (30) days to cure such breach. In the event ESI does not cure the breach, or if cure is infeasible, the Plan shall have the right to immediately terminate this Business Associate Agreement and Client shall have the right to immediately terminate the Client Agreement. If cure of the material breach is infeasible, the Plan shall report the violation to the Secretary.

(b) To the extent feasible, upon termination of the Client Agreement for any reason, ESI shall, and shall take reasonable efforts to cause any subcontractors and agents to, return or destroy and retain no copies of all PHI received from, or created or received by ESI on behalf of, the Plan. If return or destruction of such information is not feasible, ESI shall continue to limit the use or disclosure of PHI in its possession in accordance with the terms of this Business Associate Agreement as if the Client Agreement had not been terminated.

6. Indemnification. ESI will indemnify and hold harmless the Plan against any claim, cause of action, liability, damage, cost or expense, including attorneys' fees and court or proceeding costs, arising out of or in connection with any unauthorized use or disclosure of PHI or any failure in security measures affecting PHI or any other material breach of the terms of this Business Associate Agreement by ESI or any person or entity under ESI control; provided, however, ESI will not indemnify the Plan for any liability cost or expense that results from the Plan's failure to satisfy its obligations under the HIPAA Rules.

7. Miscellaneous:

(a) Amendment. The parties acknowledge that the foregoing provisions are designed to comply with the mandates of the HIPAA Rules. Should the provisions of the HIPAA Rules change or be amended, the parties shall engage in negotiations to amend the provisions of this Business Associate Agreement to comply with such changes or amendments. If the parties fail to agree on reasonable amendment to the provisions of this Business Associate Agreement, either party may terminate this Business Associate Agreement upon ninety (90) days written notice.

(b). Effect on Client Agreement. Except as it relates to the use, security and disclosure of PHI and electronic transactions, this Business Associate Agreement is not intended to change the terms and conditions of, or the rights and obligations of the parties under, the Client Agreement.

(c) No Third-Party Beneficiaries. Nothing express or implied in the Client Agreement, or in this Business Associate Agreement, is intended to confer, nor shall anything herein confer, upon any person other than the parties and the respective successors or assigns of the parties, any rights, remedies, obligations or liabilities whatsoever.

(d) Interpretation. Any ambiguity in this Business Associate Agreement shall be resolved in favor of a meaning that permits the Plan to comply with the HIPAA Rules.

(e) Effective Date. This Business Associate Agreement shall be effective as of the applicable Compliance Dates(s).

(f) Signatory. For purposes of this Business Associate Agreement, Client is signing the Client Agreement in its capacity as a duly authorized signatory of the Plan, rather than its capacity as Plan Sponsor.

ATTACHMENT 2 TO CLIENT AGREEMENT

FINANCIAL DISCLOSURE TO ESI PBM CLIENTS

In addition to the administrative fees paid to us by our clients we derive our margin in one or more of the following ways. These other revenue sources have allowed us to keep our administrative fees to our clients low. The specific terms of our contracts with our clients will affect the relative importance of these sources of margin with respect to that client.

1. Network Pharmacy Contracts. – We contract with retail pharmacies in our networks to provide prescription drugs to members of health plans sponsored by our clients. The rates paid to these pharmacies differ from network to network, and among pharmacies within a network. We generally contract with our clients to be paid an ingredient cost for drugs dispensed in a retail network at a uniform rate that applies to all pharmacies in the network that the client has selected for its plan. Thus, we may realize a positive or negative margin on any given prescription.

2. Mail Pharmacy Rates. – We purchase prescription drugs to be dispensed from our mail service pharmacies either from a prescription drug wholesaler or directly from the manufacturer. Our contracts with our clients contain rates that we will be paid for dispensing these drugs that may be greater or less than our acquisition cost on any given prescription. In general we realize an overall positive margin between our acquisition cost and the amount we are paid.

3. Manufacturer Rebate Contracts and Associated Administrative Fees. – Under our contracts with many of our clients we contract with pharmaceutical manufacturers for retrospective discounts, or rebates, on certain branded prescription drugs. We typically pay a portion of the rebate to the client, and in such cases our contract specifies the times within which we must pay these rebates to the client. We usually receive rebates from the manufacturer before we have to pay this amount to our client, and we retain the benefit of the use of these funds until we pay these amounts to the client. If a client has contracted to receive a portion of the rebate, the client has rights to audit our computation of these payments. We maintain extensive systems and processes to manage the rebate program and the formularies they support. We charge manufacturers administrative fees in connection with these programs. These fees, which we retain, do not exceed 3.5% of the AWP of the drugs for which rebates are payable under our agreements. For a complete description of our formulary development process, go to www.express-scripts.com.

4. Other Pharmaceutical Manufacturer Revenues. We currently receive other payments from pharmaceutical manufacturers that are not part of our rebate program. These payments help support certain programs, such as our Drug Choice Management Program and our Therapy Adherence Program, that support our client's formulary choices. When we receive manufacturer financial support for these programs we disclose in our program communications that one or more manufacturers have provided financial support for the program. We have been reducing manufacturer funding for drug-specific programs, and the amounts we receive for these programs are not material to our revenues. Manufacturer funding of these programs will be fully phased out by October 1, 2003. We will continue to provide formulary support programs to our clients without this targeted manufacturer funding.

5. Other Companies. Separate from our PBM services, our subsidiaries, Phoenix Marketing Services and ESI Specialty Distribution Services, contract with pharmaceutical manufacturers to provide sample accountability and distribution services and specialty pharmaceutical distribution, respectively.

March, 2003

THIS EXHIBIT REPRESENTS ESI'S CURRENT FINANCIAL POLICIES AS OF THE DATE SPECIFIED ABOVE. THIS EXHIBIT MAY NOT BE REVISED OR MODIFIED WITHOUT ESI'S PRIOR WRITTEN CONSENT. ESI MAY PERIODICALLY UPDATE ITS FINANCIAL DISCLOSURES TO REFLECT CHANGES IN ITS BUSINESS PROCESSES. IN THE EVENT OF AN UPDATE, ESI SHALL PROVIDE THE NEW FINANCIAL DISCLOSURE TO CLIENT.